IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENNETH LEE LAMPKIN,     )
                              )
        Plaintiff,     )
                              )    No. 12 CV 1727
        v.          )
                              )    Magistrate Judge
CAROLYN W. COLVIN,     )    Maria Valdez
ACTING COMMISSIONER OF     )
SOCIAL SECURITY,[1]     )
                              )
        Defendant.     )
                              )

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Kenneth Lee Lampkin's claims for Disability Insurance Benefits and Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Lampkin's motion for summary judgment [Doc. No. 16] is granted in part and denied in part. The Commissioner's cross-motion for summary judgment [Doc. No. 22] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

# BACKGROUND

## I. PROCEDURAL HISTORY

On January 8, 2009, Lampkin filed claims for both Disability Insurance Benefits and Supplemental Security Income, alleging disability since September 10, 2008. (R. 217–23.) His applications were denied on March 19, 2009 and upon reconsideration on April 23, 2009. (R. 90–99, 103–10.) Lampkin filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), (R. 111–12), which was held on July 28, 2011. (R. 30, 46–85.) Lampkin personally appeared and testified at the hearing and was represented by counsel. (*Id.*) Vocational expert Richard Fisher also testified. (*Id.*)

On September 1, 2011, the ALJ denied Lampkin's claims for both Disability Insurance Benefits and Supplemental Security Income. (R. 30–39.) The ALJ also found Lampkin not disabled under the Social Security Act. (*Id.*) The Social Security Administration Appeals Council then denied Lampkin's request for review, (R. 1–3), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. Background

Lampkin was born on February 5, 1960, (R. 217, 221), and was 51 years old at the time of the ALJ hearing, (R. 34). He is five feet nine inches tall, weighs around 185 pounds, and he has an eleventh grade education. (R. 270, 275). At

various times, he has been employed as a laborer in the construction, packing, and printing industries. (R. 56–57, 286.) Lampkin was incarcerated between November 2009 and November 2010. (R. 34, 61.) After his release, he resided both at a "halfway house" and at "Elite independent living." (R. 62, 72.)

Lampkin alleges a disability onset date of September 10, 2008, when he was 48 years old. (R. 34, 217–33.) The alleged disability results from various impairments, including diabetes, nerve damage, and a diminished ability to use his arms and hands. (R. 34.) In his first Disability Report, Lampkin reported that he is unable to lift anything or use his left arm. (R. 271.)

### B. Testimony and Medical Evidence

#### 1. Lampkin's Testimony

Lampkin testified that he has a severe, throbbing pain, which shoots down from his neck. (R. 58–59, 69.) The pain travels through his shoulders, arms, and hands. (*Id.*) He also claimed that he has tingling and numbness in his fingers and hands. (R. 59.) Lampkin testified that his right hand is more problematic than his left. (R. 69.) Lampkin stated that as a result of the tingling and numbness, he has trouble lifting and holding objects. (R. 59, 74.) Lampkin also testified that he takes the medications Motrin and Robaxin, (R. 34, 59), and that he takes Metformin for his diabetes, (R. 68).

Lampkin claimed that, unless he takes medication, he experiences pain throughout the day, and even with medication, he still suffers from some pain. (R.

73–74.) During questioning by his own attorney, Lampkin answered that he was experiencing pain during the hearing itself. (R. 73.)

Lampkin testified that he is unable to work or take care of himself because of his impairments. (R. 68.) For example, he has problems ironing clothes and washing dishes, and he must rely on family members to do those tasks. (R. 68–69.) Lampkin also testified that he often has pain while performing personal hygiene. (R. 74.) He claimed that although he is able to wash his feet with his left hand, he cannot use his right. (*Id.*) When he takes showers, he leans against a wall, and he cannot walk more than one block without becoming tired. (R. 74-75).

Lampkin testified that finding a job was part of a post-prison program that he entered into, but he was nearly denied entry into the program because his medical condition allegedly precluded him from attaining a job. (R. 64.) In both the independent living program and the halfway house where he stayed after prison, Lampkin performed chores such as cooking, mopping floors, and washing dishes. (R. 70–71.)

### 2. *Medical Evidence*

As a preliminary note, Claimant's recitation of the facts surrounding his various treatments is somewhat muddled.[2] Nevertheless, it appears as if Lampkin received treatment from Fantus Health Center ("Fantus") several times during early 2008. (R. 434–38.) At a February 15, 2008 appointment, he complained of back pain, which had allegedly begun after he received a gunshot wound to his

---

[2] For instance, Claimant states that he "began" treatment at the Fantus Health Center after moving from Florida to Illinois in late 2008 or early 2009. (Pl.'s Br. at 3.) However, the record indicates that he was treated at Fantus at least as early as February 15, 2008. (R. 435–36.)

spine in 1988. (R. 435.) He stated that his back and neck pain grew worse and sharper "by twisting motions." (*Id.*) He also complained of left arm paresthesias. (*Id.*) Lampkin's x-rays showed some amount of degenerative disc disease, and he was diagnosed with osteoarthritis of the spine. (R. 436.)

Between September 10 and September 18, 2008, Lampkin was hospitalized at Jackson Memorial Hospital in Miami, Florida. (R. 423–29.) Although he was originally admitted because of perineal pain, he also complained of neck pain. (R. 423–24.) On October 7, 2008, Lampkin underwent x-rays at Jackson, which showed "spondylosis." (R. 395, 419.) On November 13, 2008, a magnetic resonance imaging ("MRI") report showed "degenerative changes of the cervical spine." (R. 398–99.)

On November 18, 2008, Lampkin returned to Jackson because of "worse[ning]" cervical neck pain. (R. 395–97.) At the time, he claimed that the pain was predominately in his left neck and left shoulder, radiating down from his neck through his shoulder and arm. (*Id.*) He also stated that he was unable to lift up his left shoulder and suffered from numbness in his left fingers. (*Id.*)

The subsequent medical examination found that, although Lampkin had a full range of motion in his left neck, he had pain upon "palpation on the lateral aspect of the spine." (*Id.*) Furthermore, he was unable to "abduct his arm without hiking his shoulder," and he had "weakness" in his left arm "secondary to pain." (*Id.*) Lampkin was diagnosed with "cervical stenosis." (R. 396.) He was referred to physical therapy, but he had not done any therapy as of November 18, 2008. (*Id.*)

Lampkin later moved to Illinois and once more began receiving treatment at Fantus. (R. 434–45.) At a January 5, 2009 appointment, Lampkin claimed that his pain had been getting worse. (R. 441–42.) On January 23, 2009, he complained of neck pain radiating down his left arm, as well as numbness and tingling in his left hand. (R. 439.) X-rays showed "chronic posttraumatic disc disease" with "probable canal stenosis, muscle spasm." (R. 444.)

On February 3, 2009, Dr. Sherfunnissa Husain began treating Lampkin, who had come in complaining of neck, shoulder, and back pain. (R. 535–36.) The neck and shoulder pain had purportedly worsened during the four to five months leading up to the appointment. (R. 538.) Dr. Husain diagnosed Lampkin with chronic posttraumatic disc disease, "with probable canal stenosis" and "muscle spasm." (*Id.*)

At a July 14, 2009 appointment, Dr. Husain noted that Lampkin had "on and off" neck pain and stiffness. (R. 534.) Dr. Husain filled out a "Spinal Impairment Questionnaire," (R. 460–68), in which she diagnosed Lampkin with cervical disk disease and spinal stenosis (as well as with diabetes and hepatitis C), (R. 462). As for clinical findings, Dr. Husain found that Lampkin had a limited range of motion at the cervical spine, tenderness at the cervical spine of "7" to "8," reflex changes, and muscle atrophy and weakness. (R. 462–63.) Dr. Husain also noted pain in Lampkin's right and left shoulders. (R. 463.) In support of this diagnosis, Dr. Husain identified the aforementioned x-ray report from January 23, 2009. (R. 464.)

Dr. Husain reported that Lampkin's primary symptoms were pain, which accompanied movement of the neck and both shoulders, and associated fatigue. (*Id.*)

Dr. Husain also stated that Lampkin could only sit for four hours and stand/walk for two hours during the typical eight-hour workday. (R. 465.) In addition, Lampkin would need to get up and move around every half hour. (*Id.*) According to Dr. Husain, Lampkin could occasionally lift, but could never carry, up to five pounds. (R. 465–66.) Further, Lampkin's symptoms were severe enough to frequently interfere with his attention and concentration. (R. 466.) Dr. Husain also reported that Lampkin was incapable of even "low stress" work, he would likely need to be absent from work an average of two to three times per month, and he would need to take unscheduled breaks during an average workday. (R. 466–67.)

In addition, Dr. Husain listed a variety of limitations that would interfere with Lampkin's ability to work at a regular job on a sustained basis. (R. 468.) Specifically, Lampkin would need to avoid wetness, noise, fumes, gases, temperature extremes, humidity, dust, and heights. (*Id.*) Further, Lampkin had "limited vision," and he would need to refrain from pushing, pulling, kneeling, bending, or stooping. (R. 468.) Dr. Husain also noted that Lampkin had been prescribed several medications, including Gabapentin, Tylenol III, and Ibuprofen. (R. 466.)

In March 2009, Dr. Chansoo Kim performed a consultative Residual Functional Capacity Assessment ("RFC"), (R. 446–53), and concluded that Lampkin could occasionally lift twenty pounds, frequently lift ten pounds, stand/walk and sit for six hours in an eight-hour workday. (R. 447.) Lampkin could only occasionally crawl or climb ladders, ropes, and scaffolds. (R. 448.) Dr. Kim found no visual,

communicative, or environmental limitations, yet he did report that Lampkin was limited in his left arm's "reaching" ability. (R. 449–50.) Otherwise, Dr. Kim found no manipulative limitations. (R. 449.) Dr. Kim reported that Lampkin's statements regarding lifting, reaching, completing tasks, and using his hands were "partially credible." (R. 451.) However, Dr. Kim concluded that while Lampkin's medically determinable impairments could be expected to produce "some limitations in function," the extent of the limitations exceeded what was supported by Dr. Kim's review of the objective medical findings. (Id.) Further, Dr. Kim stated that Lampkin had no "visible physical limitations." (Id.) On April 22, 2009, Dr. Ernst Bone affirmed Dr. Kim's RFC. (R. 459.)

As noted above, Lampkin was incarcerated for a time, and he received medical treatment in prison. (R. 479–507.) A recorded list of his medical history included references to spinal stenosis and arthritis. (R. 480.) Of note, prison medical records suggest that Lampkin took several types of pain medication during his incarceration, including Ibuprofen/Motrin and Robaxin. (R. 480–507.) On October 17, 2010, Lampkin saw a nurse for "severe back pain." (R. 502.) At another point in 2010,[3] Lampkin again saw a nurse for back pain, and he informed the nurse that he had "spinal stenosis." (R. 504.)

After completing his prison sentence, Lampkin saw Dr. Husain in early 2011.[4] (R. 532.) Lampkin presented for a follow-up evaluation of diabetes. (Id.) Dr. Husain conducted a review of his symptoms and found no joint or muscle pain as

[3] The exact date of examination is not visible on the copied document provided in the record. (R. 504.)
[4] This document is undated, and the parties seemingly disagree as to the exact date. (Pl.'s Br. at 5; Def.'s Br. at 3.)

well as no numbness or tingling.[5] (*Id.*) Nevertheless, Dr. Husain diagnosed Lampkin with "cervical disc disease and low back pain." (R. 533.)

On May 23, 2011, Dr. Husain filled out a "Multiple Impairment Questionnaire" for Lampkin. (R. 553–60.) Dr. Husain's responses on this questionnaire were similar to her responses on the 2009 Spinal Impairment Questionnaire. Dr. Husain again described Lampkin's neck and back pain and stated that he had cervical spinal stenosis. (R. 553–54.) Dr. Husain reported that Lampkin's pain was "severe" because it rated a "10" on a scale of one to ten. (R. 555.) In a regular eight-hour workday, Lampkin would be able to sit for only four hours, would be able to stand for only five, and would need to move around every two. (*Id.*)

Dr. Husain marked that Lampkin was both "never" and "occasionally" able to lift up to five pounds and was both "never" and "occasionally" able to carry up to five pounds. (R. 556.) According to Dr. Husain, Lampkin was significantly limited in his ability to do repetitive reaching, handling, fingering, and lifting. (*Id.*) Further, Lampkin was "essentially precluded" from grasping, turning, and twisting objects with either hand. (*Id.*) Lampkin was "significantly limited but not completely precluded" from using his fingers and hands for "fine manipulations." (R. 556–57.)

Moreover, Dr. Husain noted that Lampkin's symptoms were "frequently" severe enough to interfere with his attention and concentration and that Lampkin was incapable of even "low stress" work. (R. 558.) Lampkin would need to take

---

[5] Because Lampkin's appointment was related to his diabetes, it is unclear what weight to give this review.

unscheduled breaks to rest every three to four hours during an average workday and would require ready access to a restroom. (R. 558–59.) Dr. Husain also listed other limitations that would affect Lampkin's ability to work, including the need to avoid fumes, gases, temperature extremes, humidity, dust, and heights; his limited vision; and the need to avoid pushing, pulling, kneeling, bending, and stooping. (R. 559.) As she did in the earlier questionnaire, Dr. Husain listed Lampkin's medications, which now included Ibuprofen and Robaxin. (R. 557.)

### 3. *Vocational Expert's Testimony*

Richard Fisher testified at the hearing as a Vocational Expert ("VE"). The ALJ asked the VE several questions involving a hypothetical person who is closely approaching advanced age, has an eleventh grade education, and who shares Lampkin's vocational background. (R. 76.)

First, the ALJ asked the VE whether there would be any work available to the hypothetical person if he were limited to light work—able to lift up to twenty pounds occasionally; lift and carry up to ten pounds frequently; unable to kneel, crawl, and climb ladders, ropes, and scaffolds; able to stoop or crouch only occasionally; and limited to only occasional flexion of the neck and reaching with the left arm. (*Id.*) The VE responded that this hypothetical person could work several jobs including routing clerk (3,750 available jobs in Illinois according to the VE) and mail clerk (1,650 available jobs). (R. 76–77.)

Second, the ALJ asked the VE whether there would be any work available to the hypothetical person if, instead of light work, he were limited to sedentary work

and able to lift up to ten pounds occasionally. (R. 77.) The VE responded that this hypothetical person could work as a seeder (1,700 available jobs), telephone quote clerk (2,400), and order clerk (1,200). (*Id.*)

Third, the ALJ asked the VE whether there would be any work available to the hypothetical person if he were limited to light work and further limited to only occasional handling and fingering with his left hand. (R. 77–78.) The VE responded that this hypothetical person could still work as a routing clerk and could also work as a sales attendant (4,070 available jobs) and vending machine attendant (4,000). (R. 78.)

Fourth, the ALJ asked the VE whether there would be any work available to the hypothetical person if he were limited to sedentary work and further limited to only occasional handling and fingering with his left hand. (R. 77–78.) The VE responded that this hypothetical person would be unable to perform any jobs. (R. 78.)

The VE added that, if both hands of the hypothetical person had limitations on occasional handling and fingering, the hypothetical person would be unable to perform any jobs regardless of whether he were limited to light or to sedentary work. (R. 79.) The VE also testified that, if the hypothetical person could not reach away from his body with either hand, the hypothetical person would be unable to perform any jobs. (R. 79–80.)

Lastly, the VE testified that the hypothetical person would be unable to perform any jobs if he needed to miss work two or more times per month. (R. 80–

81.) Similarly, to hold a job, the hypothetical person would need to be on task during at least eighty percent of the workday. (R. 81.)

## C. ALJ Decision

The ALJ found that Lampkin has not engaged in substantial gainful activity since the alleged onset date of September 10, 2008. (R. 32.) The ALJ further found that Lampkin has the severe impairments of cervical spine pain, lumbar spine pain, and diabetes. (*Id.*) However, the ALJ found that none of the impairments, alone or in combination, meets or medically equals any listing of impairments. (R. 33.)

Next, the ALJ found that Lampkin has the RFC to lift up to twenty pounds occasionally; to lift or carry up to ten pounds frequently in light work; to stand or walk for about six hours and sit for about two hours per eight-hour workday; to never kneel, crawl, or climb ladders, ropes, or scaffolds; and to only occasionally stoop, crouch, and perform flexion of the neck. (*Id.*) In addition, Lampkin has the RFC for occasional reaching, overhead reaching, gross manipulation, and fine manipulation with his left arm. (*Id.*)

The ALJ concluded that the objective medical evidence did not support the alleged extent of Lampkin's symptoms and limitations. (R. 34.) Generally, the ALJ found that Lampkin has not received the type of medical treatment that would be expected for a "totally disabled individual," and instead has received only limited, routine, and conservative treatment consisting mainly of medication. (R. 34–35.) The ALJ noted that Lampkin's physical examinations have been essentially within

normal limits except for pain and tenderness. (R. 35.) Moreover, according to the ALJ, the record did not support the allegations of disabling diabetes. (*Id.*)

The ALJ noted that Lampkin's allegations and testimony were not credible. (R. 35–36.) The ALJ suggested that Lampkin's time in prison serves as an "alternate explanation for his continued unemployment." (R. 36.) Furthermore, the ALJ stated that Lampkin appeared to have fully participated in the hearing without overt pain or distraction. (*Id.*)

The ALJ explicitly rejected Dr. Husain's medical opinions as recorded by the questionnaires she had filled out in 2009 and 2011. (R. 36–37.) The ALJ found the opinions to be inconsistent with the objective medical evidence, not supported by Dr. Husain's own objective findings, and seemingly based solely upon Lampkin's subjective complaints. (*Id.*) Further, many of Dr. Husain's opinions were "speculative," "extreme," or "implausible." (*Id.*)

On the basis of the RFC assessment and the VE testimony, the ALJ determined that Lampkin is unable to perform any past relevant work. (R. 37.) However, the ALJ also noted that Lampkin is able to perform other jobs that exist in significant numbers in the national economy and thus is not disabled under the Social Security Act. (R. 38.)

## DISCUSSION

### I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.

2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.

1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.  ANALYSIS

Lampkin argues that the ALJ decision was in error because: (1) the ALJ failed to properly evaluate Lampkin's credibility; and (2) the ALJ failed to follow the so-called "treating physician rule."

### A.  <u>Credibility</u>

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must give specific reasons for discrediting a claimant, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887–88).

When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case

record. *See* SSR 96-7p.[6] This includes "the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." *Id.* at *1. If the individual attends an administrative proceeding conducted by an ALJ, the ALJ may consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id.* at *5.

Lampkin initially argues that the ALJ applied the wrong legal standard by including a meaningless "boilerplate" statement often included in Social Security decisions.[7] However, the mere presence of the boilerplate language is insufficient grounds for remand. *See, e.g., Carter v. Astrue*, 413 Fed. Appx. 899, 905–06 (7th Cir. 2011) (unpublished decision). Boilerplate is permissible when an adjudicator "sa[ys] more" in support of a credibility finding. *See Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2011) (unpublished decision). In this case, although the ALJ attempted to supplement the boilerplate statement, his credibility finding was insufficiently reasoned and requires that this case be remanded.

---

[6] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law, but they are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

[7] The language in question is as follows: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 34.) This credibility "template" has been criticized because of its meaninglessness and the circular logic that it embraces. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (finding that the template "gets things backwards" and that it is "meaningless boilerplate" that "implies that ability to work is determined first and is then used to determine the claimant's credibility"). This inverted approach violates the rule that a claimant's statements about the intensity and persistence of pain or other symptoms cannot be disregarded solely because they are not substantiated by objective medical evidence. *Id.* at 646 (citing SSR 96-7p). The claimant's credibility must be factored into the RFC determination, not result from it.

Notably, the ALJ followed up his credibility conclusion with a largely neutral recitation of medical evidence contained in the record. (R. 34–35.) While the ALJ did provide specific facts in this section, it is not clear how the facts applied to the credibility assessment. The ALJ apparently rested his credibility finding on the following bases: (1) Lampkin has received only infrequent, routine, and conservative treatment for his pain, (R. 34–3); (2) Lampkin has not consistently sought treatment for diabetes, aside from medication refills, (R. 35); (3) Lampkin was able to participate fully and closely in the hearing without being distracted or exhibiting overt pain, (R. 36); (4) during Lampkin's prison stay, a nurse noted that he had no visible motor difficulties, (R. 35); (5) a prison nurse noted that Lampkin had a demanding demeanor when he sought treatment, (id.); and (6) Lampkin's continued unemployment might simply be the result of his period of incarceration, (R. 36).

First, the ALJ noted that Lampkin has received infrequent, routine, and conservative treatment since his 1988 gunshot wound. The ALJ listed several reasons supporting his finding that Lampkin has only received "limited" treatment: Lampkin has not been referred to a pain clinic or specialist for back pain; he does not use an "assistive device" to walk; and the record does not show that he has been recommended for surgery or has attended physical therapy. (R. 35.) But the ALJ did not reconcile those findings with contrary evidence in the record. See Zurawski, 245 F.3d at 888. At the hearing, Lampkin testified that Dr. Husain has recommended both physical therapy and surgery. (R. 66–67.) Lampkin stated that he has not yet gotten into the physical therapy clinic because the clinic is still "debating" the idea.

(R. 67.) The record also suggests that Lampkin did not undergo physical therapy in 2008 because he had difficulty securing transportation. (R. 396.) As to surgery, Lampkin testified that Dr. Husain has warned him of the "50/50 chance" of post-surgery paralysis, and Lampkin also explained that he is "scared" about the possible risks of surgery due to his diabetes. (R. 66-67.) Dr. Husain's records also note that Lampkin missed neurosurgical and MRI appointments due to his incarceration. (R. 553.) The ALJ did not examine the meaning of this testimony or evidence, nor is it clear what weight, if any, the ALJ gave it when assessing Lampkin's credibility.

The ALJ noted that Lampkin's "physical examinations have been essentially within normal limits" aside from some pain and tenderness. (R. 35.) Ignoring for the moment that the record does contain some objective signs of impairment, (R. 398–99), it is the severity of Lampkin's pain that is precisely at issue in the credibility determination. It is relevant that Lampkin has complained of back pain since at least 2008, (R. 435), and that he took pain medication before, during, and after his incarceration, (R. 466, 480-507, 557). *See Wyatt v. Astrue*, No. 09 C 5768, 2011 WL 2149414, at **16–17 (N.D. Ill. June 1, 2011).

The ALJ clearly drew a negative inference from Lampkin's lack of certain treatments and his nonuse of an assistive walking device. However, "[t]here are many possible explanations" one may have for not pursuing treatment at a pain clinic. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). The ALJ never questioned Lampkin at the hearing about either pain clinics or walking devices.

19

"[A]n ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (citing SSR 96-7p). Lampkin's potential reasons must be explored on remand.

Next, the ALJ based his the credibility finding on his own observations of Lampkin at the hearing, at which Lampkin was apparently able to participate "fully" and demonstrated no "overt pain behavior." (R. 36.) However, the Seventh Circuit has doubted the probative value of this type of observational evidence. *See Powers*, 207 F.3d at 436. But more significantly, the ALJ did not explain how Lampkin's full participation in the hearing served to undercut his credibility. When one merely fails to exhibit pain during a hearing, it does not automatically follow that he is incredible or is not suffering from pain that would prevent him from working on a full-time basis. Moreover, under questioning by his own attorney, Lampkin testified that he was experiencing pain during the hearing, and he claimed he had been massaging his hand and forearm due to pain. (R. 73.) It is not clear whether the ALJ considered this testimony, because it was not mentioned in the opinion.

In his decision, the ALJ also cited a prison nurse's observation that Lampkin was able to "rock[] back and forth then side to side" and that Lampkin had no difficulty ambulating or getting up or down from the examination table. (R. 35, 504.) The ALJ suggested that this observation was "important[]," but he did not elaborate as to why or how. (R. 35.) The ALJ also did not explain the weight given to the nurse's observation with respect to the overall credibility assessment.

The ALJ also noted that prison treatment notes indicated that Lampkin had a "demanding demeanor" at times and had once raised his voice to a nurse, (R. 35, 504), but he neglected to articulate what relevance this anecdotal evidence might have to the credibility finding. Indeed, without further analysis, the fact that Lampkin "demanded [that] a nurse give him, Tylenol," (R. 35), could be seen to bolster, rather than undermine, Lampkin's allegations of chronic pain.

Finally, the ALJ opined that Lampkin's continued unemployment could be the result of Lampkin's criminal record, rather than any physical impairment. (R. 36.) However, the ALJ did not expound upon this speculative statement, and accordingly its relevance is unclear.

## B. <u>Treating Physician Rule</u>

Lampkin next argues that the ALJ failed to follow the "treating physician rule" by not appropriately weighing the opinion of his treating physician, Dr. Husain. An ALJ must give controlling weight to a treating physician's opinion if the opinion is both "well-supported" and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). The ALJ must also "offer good reasons for discounting" the opinion of a treating physician. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted); *Scott*, 647 F.3d at 739.

As the ALJ pointed out, the two questionnaires filled out by Dr. Husain both contain cursory responses with little elaboration. (R. 36, 462–68, 553–60.) Further, they are almost entirely based on Lampkin's subjective complaints. (*Id.*) While

subjective complaints are relevant, they are also the "opposite of objective medical evidence," and as such, they "do not compel the ALJ" to accept Dr. Husain's opinion. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

As to the objective bases for Dr. Husain's opinions, the doctor did cite to x-rays dated January 23, 2009. (R. 444, 464.) These x-rays showed "chronic posttraumatic disc disease, moderate at C5/6, lesser degree, C6/7 with probable canal stenosis." (R. 444.) But while this is relevant objective evidence, the x-rays alone do not support the extent of the limitations described by Dr. Husain.

Moreover, Dr. Husain's opinions are inconsistent with other substantial evidence in the record, specifically the RFC completed by Dr. Kim. As an initial matter, although both the Claimant and the ALJ have characterized Dr. Kim as a "non-examining" physician, (R. 36; Pl. Br. at 8), Dr. Kim's RFC refers to a "face to face interview" with Lampkin as well as additional observations. (R. 451.) While a contradictory opinion of a non-*examining* physician does not "by itself" constitute substantial inconsistent evidence, *see Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), a non-*treating* physician's opinion may generally suffice as such, *see Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

For the above reasons, the ALJ appropriately declined to give Dr. Husain's assessment "controlling" weight. But this determination does not end the inquiry. An ALJ must still determine what value the treating physician's assessment does merit. *Scott*, 647 F.3d at 740; *Campbell*, 627 F.3d at 308. The regulations clearly require the ALJ to consider a variety of factors, including: (1) the length, nature,

and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion. *See id.*

In this case, the ALJ did not address the required factors before rejecting Dr. Husain's opinions completely "because they are not consistent with the objective medical evidence." (R. 36.) But this conclusory rationale merely justifies not giving the opinions *controlling* weight and obscures the correct legal standard. Though the ALJ noted that Dr. Husain's opinions are neither well-supported nor consistent with other substantial evidence, he did not discuss the relevance of the two key questionnaires being largely consistent with one another. The ALJ also seemingly ignored the fact that Dr. Husain treated Lampkin numerous times between 2009 and 2011, both before and after his incarceration. (R. 531–38.) Evidence from the hearing suggests that Dr. Husain has prescribed medicine, performed physical therapy and other tests, and recommended surgery. (R. 65–67.) The ALJ himself noted during the hearing that Lampkin had been seeing Dr. Husain "for a while." (R. 65.) The ALJ should have addressed and weighed this evidence in his decision. However, the Court expressly emphasizes that it has no opinion as to the proper weight to give Dr. Husain's opinions on their own or in relation to Dr. Kim's RFC.

## CONCLUSION

For the foregoing reasons, Plaintiff Kenneth Lee Lampkin's motion for summary judgment [Doc. No. 16] is granted in part and denied in part. The Commissioner's cross-motion for summary judgment [Doc. No. 22] is denied. The

Court finds that this matter should be remanded to the Commissioner for further

proceedings consistent with this Order.


**SO ORDERED.**                                    ENTERED:


**DATE:** ___ **March 5, 2014**        _____
                                        **HON. MARIA VALDEZ**
                                        **United States Magistrate Judge**